■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v GREGORY RADCLIFFE, Appellant. [711 NYS2d 436] —Appeal by the defendant from a judgment of the County Court, Westchester County (Leavitt, J.), rendered November 18, 1996, convicting him of murder in the second degree and criminal possession of

a weapon in the second degree, upon a jury verdict, and imposing sentence. The appeal brings up for review the denial, after a hearing, of that branch of the defendant's omnibus motion which was to suppress identification testimony.

Ordered that the judgment is affirmed.

The victim was attacked and shot while walking along a street in Mount Vernon with a friend. The victim's friend fled the scene when the attack commenced. The friend's pretrial identification of the defendant was suppressed because the defense counsel was improperly excluded from the lineup procedure. However, the court permitted that witness to make an in-court identification of the defendant on the ground that there was an independent source for the identification. The defendant contends that the court erred in permitting the in-court identification because the evidence adduced at the suppression hearing failed to establish an independent source. We disagree.

A witness may identify the perpetrator of a crime as part of his or her in-court testimony, notwithstanding the existence of a procedurally-defective pretrial identification procedure, provided that the People establish by clear and convincing evidence that the in-court identification is based upon the witness's independent observation of the defendant (see, People v Hyatt, 162 AD2d 713, 714; see also, People v Thomas, 51 NY2d 466, 474-475). The amount of time a witness has to observe the defendant is only one factor to be considered under the totality of circumstances surrounding an identification (see, People v Hyatt, supra; People v Androvett, 135 AD2d 640, 642). Here the evidence shows that the eyewitness had an unobstructed view of the defendant, albeit for a short period of time, under good lighting conditions, and her description was sufficiently specific to establish her ability to observe the defendant at the time of the crime (see, People v Hyatt, supra; see also, People v Webster, 248 AD2d 738; People v Fuentes, 240 AD2d 511; People v Macovey, 234 AD2d 393).

The trial court did not err when it precluded defense counsel from asking certain questions on cross-examination. During the People's direct case, a witness testified that blood and hair samples were taken from the defendant pursuant to court order, that a hat was recovered from the scene of the crime, and that a coat was seized from the defendant's apartment pursuant to a search warrant. On cross-examination, this witness stated that the hair and blood samples and the recovered physical evidence were submitted to the Federal Bureau of Investigation for forensic analysis. Although the trial court permitted the defense counsel to ask if the "purpose of taking

hair samples * * * was to compare [defendant's] hair samples with hair samples found in the apartment?", it did not allow the follow-up question, "and if the hair samples matched?" The defense counsel made no further inquiry on this issue and never specifically asked about the forensic test results. Accordingly, the defendant's present claims that the court's ruling violated his Sixth Amendment right to confront witnesses and did not allow him to present evidence on his own behalf are not preserved for appellate review (*see,* CPL 470.05; *People v Hughes,* 251 AD2d 513; *People v Kaufman,* 156 AD2d 718).

In any event, those claims are without merit as the People neither raised the issue of the test results nor offered the laboratory report into evidence (*see, People v Taylor,* 91 AD2d 729). Furthermore, in his summation the defense counsel was permitted to comment on the fact that the test results were not divulged to the jury, and to suggest that this was because the results did not link the defendant to the crime.

Viewing the evidence in the light most favorable to the prosecution (*see, People v Contes,* 60 NY2d 620), we find that it was legally sufficient to establish the defendant's guilt beyond a reasonable doubt. Moreover, upon the exercise of our factual review power, we are satisfied that the verdict of guilt was not against the weight of the evidence (*see,* CPL 470.15 [5]).

The defendant's remaining contentions are either unpreserved for appellate review or without merit. Santucci, J. P., Joy and Schmidt, JJ., concur.

Goldstein, J., dissents, and votes to reverse the judgment, on the law, and to order a new trial, with the following memorandum: I do not find that the evidence against the defendant was legally insufficient, nor do I find that the verdict was against the weight of the evidence, nor do I contest the admissibility of the identification testimony presented. Rather, I find that the curtailment of the defendant's cross-examination, which precluded the defendant from presenting exculpatory evidence to the jury, deprived the defendant of a fair trial and that such error was not harmless.

On the evening of November 10, 1995, the victim was shot by an individual wearing what eyewitnesses described as a light brown jacket and a "beige" "ski-type" hat. The victim was walking to a store with a 15-year-old girl when the perpetrator approached him.

At the trial, the sole witness to identify the defendant as the perpetrator was the 15-year-old witness. She testified that, as she and the victim were walking to a store, the victim said "he had a beef with people in Mount Vernon, and if anything hap-

pened I should run". As they were crossing the street, she observed a man, whom she had never seen before, sitting in the passenger seat of a car stopped at a red light, shining a flashlight at her and the victim. The car sped away, but less than a minute later, she observed that same man walking toward her and the victim. When the man pushed the victim against a fence and pulled out a gun, she fled the scene. She went home, and had no contact with the police until "they came" to her house. She described the perpetrator to the police as about her own height, five feet three or five feet four inches tall. She identified the defendant, who is 5 feet 10 inches tall, in a lineup, but her lineup identification was suppressed prior to trial. At the trial, she was permitted to make an in-court identification.

The remaining evidence against the defendant consisted of testimony that on July 29, 1995, the defendant was stabbed when someone attempted to steal a bicycle he was riding, testimony from the victim's girlfriend that the defendant thought the victim was the perpetrator of the attempted robbery and threatened to shoot the victim in revenge, and certain physical evidence seized from the crime scene and the defendant's residence.

The physical evidence consisted of a "beige or white hat", a spent shell casing, and a gold chain recovered from the scene, and a beige coat matching the description of the coat worn by the assailant during the shooting recovered from the defendant's residence pursuant to a search warrant. The detective in charge of the investigation testified on direct examination that blood and hair samples were taken from the defendant pursuant to a court order. On cross-examination, the defense counsel elicited that the hat recovered from the scene and items seized from the defendant's residence were submitted to the Federal Bureau of Investigation (hereinafter the FBI) for forensic analysis, along with hair and blood samples from the defendant.

The report prepared by the FBI revealed that no hair or blood from the defendant was found on the items found at the scene, including the hat, nor was any blood from the victim found on the items recovered from the defendant's residence. However, when the defense counsel asked "if the hair matched", the prosecutor's objection to that line of questioning was sustained.

The trial court's ruling precluded the defendant from presenting evidence in his behalf (*see, People v Cummings,* 191 AD2d 1012; *People v Mullins,* 179 AD2d 48; *People v McClin-*

*ton,* 75 AD2d 900), and prevented the defendant from meaningfully cross-examining the officer with respect to physical evidence which the People contended linked the defendant to the crime. Since the purpose of the defendant's line of questioning was apparent, it cannot be said that this issue is unpreserved for appellate review (*see,* CPL 470.05 [2]; *cf., People v Lyons,* 81 NY2d 753; *People v George,* 67 NY2d 817).

*People v Taylor* (91 AD2d 729, 730), cited by the majority, is clearly distinguishable. In that case, the defense counsel explicitly adopted a trial strategy that "negative test results had no probative value". In the instant case, on the other hand, the defense counsel attempted to bring the issue of the negative hair results to the attention of the jury when he commented in summation, "Ask yourselves when you go into that jury room, why weren't you told about the results of those forensic tests?", and further commented that the absence of such evidence created a reasonable doubt. However, inviting the jury to speculate as to the existence of exculpatory evidence cannot be equated with the admission of exculpatory evidence. Indeed, the jury was properly instructed that it could "not consider or speculate on matters not in evidence".

The primary proof against the defendant consisted of the identification of a single witness, who observed the perpetrator for the first time at night, once through a car window and the second time as she fled the scene. Such evidence, although legally sufficient, can hardly be deemed overwhelming evidence. Therefore, the exclusion of the proffered evidence cannot be deemed harmless error (*see, People v Crimmins,* 36 NY2d 230, 241; *People v Robinson,* 267 AD2d 336; *People v Seymour,* 183 AD2d 35).

With respect to the quality and quantity of proof, the prosecutor himself noted in summation: "[I]n evaluating the strength of the case, we're not asking you to rely on a 15 year old. First we called * * * the first officer on the scene. He set the tone for you, I think, to understand. This isn't like a TV movie, this is real life. The mean streets of Mount Vernon. This is a crime scene where cars were actually, casually driving around a guy laying face down in the street on a main intersection in Mount Vernon. Other people were turning their backs on the first police officer to arrive * * * That is the environment this case occurred in and this investigation was conducted in. This is an uphill battle from the police point of view".

The uphill battle faced by police officers "on the mean streets of Mount Vernon" did not justify preventing meaningful cross-examination or excluding exculpatory evidence.

In view of the foregoing, I would reverse the judgment of conviction and order a new trial.